UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Jerome Dock,)
)
    Plaintiff,)
)
v.) No. 16 CV 50277
) Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting)
Commissioner of Social Security,[1])
)
    Defendant.)

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerome Dock appeals the denial of Social Security disability benefits. In January 2009, plaintiff was fired from his job. He then sought benefits from the Veterans Administration ("VA"). In March 2009, a VA doctor named Chris Cornett made findings leading to the determination that plaintiff was 70% disabled which meant that, under VA rules, he would receive a monthly payment of approximately $3,000. R. 235. In February 2010, plaintiff filed applications for disability benefits from the Social Security Administration ("SSA"). In his initial filings, he alleged that he was disabled based on complications from a 1992 gunshot wound to his hip, ulcers, and knee and hip problems. R. 276. The gunshot wound occurred in a friendly fire incident during a military tour of duty in Central America. R. 364. As his case progressed, plaintiff added back and neck problems to the list. Plaintiff had spinal surgery in 2007, which provided significant help according to doctors. R. 453. Plaintiff alleges that these cumulative impairments cause severe pain, keeping him home-bound and even bed-bound for large chunks of the day. In 2014, the administrative law judge ("ALJ") found that plaintiff was not disabled.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Plaintiff now argues that the ALJ committed two primary errors and argues that the case should be remanded for a new hearing and decision.

**BACKGROUND**

To date, there have been two administrative hearings and two decisions, both by the same ALJ. Plaintiff was represented by the same counsel throughout these proceedings. The ALJ and plaintiff's counsel both questioned the witnesses at these hearings. The general topics explored included plaintiff's employment history, his activities, his pain levels, his use and need for a cane, his treatment history, a functional capacity evaluation, and his medication side effects. Some highlights are set forth below.

The first hearing was held in August, 2011. Other than plaintiff, the only witness was the vocational expert. Plaintiff, who was then 44 years old, testified that he had an associate degree in network engineering and last worked full-time at Pierce Packaging where he was a team leader who hired and supervised other workers. The ALJ noted that plaintiff worked until January 2009, well after his 2007 spinal surgery. Plaintiff explained that his employer "really catered to me as much as possible." R. 84. But then, for reasons that were unclear to plaintiff, his supervisor fired him. R. 85 ("Then up one day she just calls me into the human resource offices with three write ups and fired me for crappy work is what she put on there."). Plaintiff blamed these problems on his medication, which made him fall asleep. R. 85.

As for his current situation, plaintiff testified that he could sit about 20 to 25 minutes and then his "leg goes completely numb" and "feels like [he has] been kicked in [his] buttocks with a steel toe boot." R. 81-82. The ALJ asked how long plaintiff had been using the cane that he brought with him to the hearing, and plaintiff stated "about a year." R. 83. Plaintiff took four Vicodin pills and two Gabapentin pills each day. He did not mow the lawn or shovel snow, but

sometimes did his own laundry, though not regularly. His teenage sons (age 19 and 16) took care of themselves and also did "some odds and ends shopping" for plaintiff. R. 86.

Plaintiff's attorney then asked whether plaintiff was using a cane in March 2009 when he was assessed by Dr. Cornett. Plaintiff stated that it "wasn't prescribed" but that he "got a cane from a friend of [his] who helped [him] during that time." R. 89. Counsel asked how long plaintiff stayed in bed; he answered that he did so "continuously" from about 12 to 5 pm. R. 90. He testified that his medications made him "sleepy, drowsy, goofy." R. 91. His condition worsened after he stopped working in 2009. He was "starting to get this hip thing," something he had not been treated for before then. R. 91. He stated this was the hip where he was shot a number of years ago (*i.e.* in 1992, according to other records). R. 92. The low back pain had been constant "before and after [his] surgery." *Id.*

On September 22, 2011, the ALJ issued an eight-page decision finding plaintiff not disabled. Plaintiff appealed this decision administratively, and the Appeals Council remanded the case for a new hearing and decision.

The second hearing was held on August 22, 2014. The ALJ questioned plaintiff first, asking him whether things had gotten worse since the first hearing. Plaintiff stated that he now had "pinched nerves across [his] neck" causing his "fingers [to] go numb." R. 24. Plaintiff stated that he lived alone in a townhouse with two floors. Dr. Reyes was still his primary care physician. Throughout this hearing, the ALJ asked about treatments plaintiff had tried—or not tried—to alleviate his conditions. The ALJ asked, for example, whether plaintiff had received treatment after his December 2012 MRI. Plaintiff answered as follows:

> I just had the physical therapy, and once [the physical therapist] gave me the home exercises, I just continued on with my regular pain management, and I do [] the exercises when it gets real, real bad, and it gives me a little relief but I still have the symptoms of the pinched nerves.

3

R. 26. The ALJ asked about plaintiff's "no shows" for physical therapy appointments ordered by Dr. Reyes. Plaintiff admitted that he only went a few times.

Plaintiff's counsel also asked questions, addressing various issues including pain medication. Counsel asked whether plaintiff had any upcoming appointments for treatment, and he only had a dental appointment and no treatments scheduled for his neck or back. R. 34.

The ALJ then asked about medication side effects.

> Q Okay. Now, you talked this afternoon about the impact of the medication you're taking, as far as the [effect] it has on you. Forgetfulness, grogginess and sedation. Anybody that you've mentioned this to? For example, Dr. Reyes is your primary care source, right?
>
> A Yes, sir.
>
> Q Ever tell Dr. Reyes that the medication he's giving you is causing you to feel forgetful or sleepy or groggy?
>
> A Yes.
>
> Q I'm not trying to say that you had to do this with any emphasis, but you told him more than once where he would be more likely than not to make a note of the fact that the medication is affecting you?
>
> A I just figured that he knows that, because it says it on the label that it's going to cause drowsiness and different things like that. I told him the [effects] of it.

R 35.

The ALJ asked plaintiff about his knees problems. Plaintiff stated that they "ache all the time" and that this had been going on for "more than 30 years now." R. 36. The ALJ asked plaintiff, again, whether he raised the problem with Dr. Reyes. Plaintiff answered as follows:

> I've mentioned it before, but he don't seem to do anything. He'll basically ask me a few questions and he'll type [] it up. And then next thing you know I'll be going to see somebody in Madison. He'll check and see if my lungs are clear, and any other problem I had, he'll prescribe medication.

R. 36. The ALJ then returned to the issue of missed physical therapy appointments in 2013. Plaintiff explained as follows: "That was during the times [] I was really having some bad days. I wasn't able to make them, and he just never prescribed, and I just went on ahead with the regular [pain] management. I just—I couldn't make it." R. 37.

The ALJ then called Dr. Fischer to testify.[2] He testified that plaintiff had "chronic low back pain, lumbosacral degenerative disease," that he had suffered a gunshot to the right pelvic bone, that he had spinal fusion surgery in 2007, and that he had cervical spine degenerative disease and cervical spondylosis causing chronic neck pain. R. 38-39. He stated that the knee arthralgia and stomach issues were not severe. The ALJ then asked about Listing 1.04. Dr. Fischer gave the following answer:

> [F]irst, I didn't even see a lumbar spine MRI in the file. The file indicated that he did have the injuries I referred to back in 2007, but [as] one of the doctors in the record at 3F, 33, summarized. That's a good summary of what happened to claimant, and after the surgery gunshot wound and his spine. He was released from care in October 2007 and returned to work. He lost his job in January 2009, and is not currently working. So, in other words, after that original injury, he recovered and was able to work, and subsequent to that, I did not see, other than complaints of chronic low back pain, I did not see a lumbar spine MRI, an EMG or anything that would satisfy the requirements at 1.04, like herniated disk, nerve root impingement with you know affective ambulation. I did not see that anywhere.

R. 39-40. The ALJ then asked Dr. Fischer about Dr. Reyes's comment that plaintiff should be able to return to work after being instructed in back care and should add cardiovascular exercise to his daily activities. R. 40. Dr. Fischer responded as follows:

> My opinion is that reading further, goals, he should be able to walk a distance of one mile in about eight weeks, et cetera. I believe he thought that he could be able to get back to his relatively normal amount of walking, standing, et cetera, with some rehabilitation. In other words, again, even those quotes I don't recall seeing further workup for the back pain issue and see no reason he thought [] his condition worsened.

R. 40-41. The ALJ then asked about plaintiff's neck. Dr. Fischer answered as follows:

---
[2] He was a specialist in internal medicine. R. 38.

> [T]here is a cervical spine MRI in December 2012, and it showed cervical spondylosis and some left-sided neuroforamen narrowing. Otherwise the cervical spondylosis is just cervical degenerative disease. No significant disk herniations, et cetera, and he also had an EMG done. I believe it's the right upper extremity. That was normal as well, and that was in one of the pages of the VA records. Page 101. Your Honor, also noted that one note dated January 17, 2013. [] It says, neck began about three months ago. So, that would have put it roughly September 2012 that he related the neck pain began.

R. 41-42. The ALJ asked about follow-up treatment for the neck after the December 2012 MRI, and Dr. Fischer stated that, other than prescribed medication, he did not see any treatment or follow up. Dr. Fischer agreed that Dr. Reyes, who had treated plaintiff for a "while," did not record any upper extremity weakness, upper extremity sensation disturbance, atrophy, or range of motion abnormality. R. 42-43. Dr. Fischer then concluded that plaintiff was "capable of light physical exertional work." R. 44.

The ALJ then asked about plaintiff's functional capacity evaluation ("FCE") in December 2010. Dr. Fischer criticized this report, noting for example that he found it unusual that plaintiff's grip strength got stronger after more exertions. He described it as a "minimal" FCE and stated that the "real gold standard" was a two-day FCE. R. 45. The ALJ then asked Dr. Fischer why he believed plaintiff could do light work. He stated as follows:

> The back surgery, as you pointed out, was seven years ago. The medical records show that he returned to work. Like I said, we really do not have any significant objective tests that show that he has any ongoing significant back trouble. I believe that the FCE [] says he was [] presenting ambulatory with a cane. However, in the medical records, I did not see where a cane was prescribed or that [it] was even medically necessary. [] I don't believe the medical evidence supports that he has weakness in his legs, that he had any radiculopathy going down his legs, and other than his subjective complaints of numbness in his big toe or numbness somewhere else, and his complaint of chronic back pain, the medical evidence, the objective evidence does not support that he has anything that's continued that would prevent him from standing and walking, as required by light work.

R. 45-46.

The ALJ then asked Dr. Fischer about Dr. Cornett's statement that plaintiff was more limited by medication side effects than from "his physical diagnoses in and of themselves." R. 48. Dr. Fischer stated that he "did not see anything in the record" indicating that plaintiff "had an ongoing problem related to medication concentration, grogginess, et cetera." R. 49. Responding to plaintiff's testimony that his medication labels listed grogginess as a possible side effect, the ALJ asked whether he should draw an inference from that fact. Dr. Fischer answered as follows:

> No. I don't believe you can infer that just because it says that on the label. Those are not highly or extremely potent medications, and I would not expect them to cause ongoing sedation or difficulty concentrating, et cetera, especially if he's on a stable dose of the medication. I would assume very shortly after being on a stable dose that any side effects like that he would develop a tolerance to, and they would not be an issue.

*Id.* When asked how long he would expect plaintiff to develop a tolerance, Dr. Fischer stated that it would be "[w]ithin a couple weeks perhaps." *Id.*

The ALJ then allowed plaintiff's counsel to question Dr. Fischer about any matters that may have been overlooked. Counsel asked about any limitations "as far as turning the head from side-to-side." R. 51. Dr. Fischer answered as follows:

> The reason I gave the limitation regarding the reaching overhead only occasionally was more for the cervical spine than for the arm. So, when you [] reach overhead by inference you almost have to raise your head up to look [] what you're doing. So, that's the reason for that limitation. I [] did not see any significant restriction limitation regarding turning the head side-to-side, but that would limit him from having to extend his neck or look overhead more than occasionally.

R. 52. Counsel asked about medication side effects, and Dr. Fischer stated that they were "not recorded." R. 56. Counsel then asked whether "generally speaking" Tramadol and Gabapentin had a "potential side effect" of drowsiness. *Id.* Dr. Fischer answered as follows: "The way you phrased that question, I agree that a potential side effect. Does that mean the claimant has it? No. But that is a potential side effect." *Id.*

7

On November 26, 2014, the ALJ issued a 15-page decision. The ALJ found that plaintiff did not meet Listing 1.04. The bulk of the decision focused on the ALJ's finding that plaintiff had the residual functional capacity ("RFC") to do light work subject to certain limitations. The ALJ acknowledged that plaintiff's testimony suggested that his limitations were greater, but the ALJ found that plaintiff lacked credibility in making these statements. This conclusion rested on two primary rationales. First, the ALJ concluded that there was a lack of supporting objective evidence. *See* R. 135 ("the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations"). Second, the ALJ concluded that plaintiff inconsistently sought treatment, and when he did, the treatment was mostly conservative and generally worked. *See* R. 138 ("despite the claimant's allegations of severe symptomatology, basic exercise routines and conservative treatment such as use of ice packs were successful in treatment, which begs the question why the claimant was absent from appointments so regularly, and did not pursue this treatment with more vehemence").

## DISCUSSION

Plaintiff's opening brief, which contains a long fact section (nine pages) followed by a shorter analysis section (four pages), sets forth two primary arguments for remand. They focus on different stages of the five-step process. The first argument is that the ALJ erred in the listing analysis at Step Three. The second is that the ALJ cherry-picked evidence and played doctor. This argument focuses mostly on the RFC determination at Step Four.

**I.     Listing 1.04.**

The purpose of the listings is to "streamline[] the decision process by identifying those claimants whose medical impairments are *so severe* that it is likely they would be found disabled *regardless of* their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)

8

(emphasis added). Plaintiff argues that the ALJ erred in finding that plaintiff did not meet (or equal) Listing 1.04, entitled "Disorders of the spine." This listing contains several long, multi-part tests with many technical medical terms. Plaintiff argues that the ALJ's explanation was cursory. The explanation was as follows:

> With respect to the claimant's back impairment the applicable listing section is 1.04, which requires, among other things, evidence of a compromised nerve root with abnormal clinical findings such as motor loss, sensory or reflex loss, and positive straight leg raising. These abnormal findings have not been shown on a consistent basis. The other aspects of section 1.04 have been fully considered and also are not appropriately documented in the record.

R. 133. This three-sentence explanation contains no analysis of the requirements of 1.04A (it merely lists them) and only hints at a broader rationale (lack of consistency). The Court, therefore, agrees with plaintiff that it is cursory as defined by the Seventh Circuit. *See Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) (remanding because the ALJ's two-sentence discussion contained "no analysis whatsoever" and was "the very type of perfunctory analysis we have repeatedly found inadequate"); *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (remanding because the ALJ's cursory analysis—that claimant "did not display limitation of motion of the spine as anticipated by section1.04A"—was insufficient); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

In response, the Government argues that plaintiff bears the burden of showing he can meet the listing requirements and argues that he has not done so. In effect, the Government is asserting that any error was harmless. This Court finds this argument persuasive under the facts of this case. As this Court has noted, there is some uncertainty as to whether (and how) the harmless error doctrine applies in this type of case. *See Edmonson v. Colvin*, 2016 WL 946973, *5 (N.D. Ill. March 14, 2016). In several of the cases cited above, the Seventh Circuit, after finding that the analysis was cursory, nonetheless discussed the evidence and found that it was,

9

for example, "significant," which could be viewed as a de facto harmless error analysis. *Kastner*, 697 F.3d at 648 ("Because the only evidence in the record demonstrated significant limitations in Kastner's range of motion, the ALJ's contrary conclusion is peculiar and unexplained."); *Minnick*, 775 F.3d at 936 ("Minnick's degenerative disc disease may well have satisfied Listing 1.04A"). This Court construes these cases as providing a limited opening for the harmless error doctrine. Several facts support its application here.

First, plaintiff's opening brief fails to make a coherent case for why the requirements of 1.04A have been met or equaled. Significantly, plaintiff concedes that "there was no nerve root impingement on Plaintiff's *most recent* MRIs of his spine." Dkt. #7 at 12 (emphasis added). This fact alone casts doubt on his argument. As for the other Listing 1.04 requirements, plaintiff does not systematically discuss them. Instead, he lumps together medical findings *generally* showing that he had problems with his spine and hip and leg. But a listing requires that the precise requirements *all* be met or equaled. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of disability benefits [] under step three."); *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original).

Second, no medical expert has opined that plaintiff met or equaled these listing requirements. Therefore, plaintiff's argument rests on counsel's layperson analysis. In contrast, the ALJ relied on the expert opinion of Dr. Fischer, who discussed this issue at the second administrative hearing, as summarized above. This case thus differs from those cited above where the ALJ did not rely on a medical expert. *See, e.g., Barnett*, 381 F.3d at 670 ("the ALJ

10

never consulted a medical expert regarding whether the listing was equaled"); *Minnick*, 775 F.3d at 936 ("the ALJ never sought an expert's opinion as to whether any of the evidence could support a finding of equivalency"). It is true, as plaintiff argues, that Dr. Fischer testified several times that he did not see any lumbar MRIs in the file, which would mean that he overlooked plaintiff's September 2010 MRI. Plaintiff suggests that this was an important piece of evidence that could have persuaded Dr. Fischer to change his mind. The failure of Dr. Fischer to comment on this evidence potentially raises questions about the reliability of his opinion, but the Court is not persuaded that a remand is required. As the Government notes in its response brief, this issue is irrelevant because the 2010 MRI "did not show any spinal cord abnormalities or nerve root compromise." Dkt. #11 at 6. In his reply brief, plaintiff does not contest this assertion, and therefore implicitly acknowledges that the MRI was not significant, nor materially different from the other pieces of evidence relied on by Dr. Fischer.

Third, although plaintiff now complains that the ALJ gave insufficient attention to the listings argument, plaintiff's counsel ignored this issue in the lengthy administrative proceedings. Insofar as this Court can determine, counsel never once flagged this issue, despite multiple opportunities to do so. Specifically, before the first hearing, counsel submitted a letter brief, but did not mention Listing 1.04. *See* 16E. Counsel likewise did not refer to this argument during the first hearing. After the ALJ's first decision, which contained a cursory analysis of Listing 1.04A, one very similar to the analysis later included in the second decision, plaintiff's counsel filed a letter brief to the Appeals Council raising five specific arguments for remand. R. 348-50. However, none of these were directed at the listings analysis. At the second hearing, Dr. Fischer testified about Listing 1.04 and other issues. Yet, when plaintiff's counsel asked him questions, counsel never broached this topic, nor specifically mentioned the 2010 MRI that current counsel

now focuses on. For all the above reasons, the Court finds that plaintiff has not met his burden of showing that he met Listing 1.04A.

## II. Cherry-Picking and Doctor-Playing.

Plaintiff's second argument is that the ALJ cherry-picked evidence and improperly played doctor. This argument is shorter, consisting of only one long paragraph in the opening brief and a few sentences in the reply brief, which itself is only a page and a half. Plaintiff raises two areas of focus. The Court is not persuaded that the ALJ made any errors worthy of remand.

First, plaintiff notes that the VA doctor, Dr. Cornett, found that plaintiff met the standards for individual unemployability. It is not clear what this term means in VA regulations, but as the Seventh Circuit recently noted, the VA and the SSA use different criteria, and specifically "the VA's evaluation is pro-claimant rather than neutral," which is "not SSA's approach." *Bird v. Berryhill*, 847 F.3d 911, 913 (7th Cir. 2017).[3] Therefore, the VA's determination offers no guidance to the precise issues here.

Relatedly, plaintiff relies on a specific finding made by Dr. Cornett. Plaintiff states that Dr. Cornett found that plaintiff "suffered significant fatigue from his pain medicine." Dkt. #7 at 13. In fact, Dr. Cornett did not use the word significant; this is plaintiff's interpretation of Dr. Cornett's findings. A review of his findings reveals a more ambiguous and lukewarm assessment. Here is the portion where he commented on medication side effects:

> Given the fact that the veteran is on chronic narcotics as well as gabapentin for his pain, it appears that his work activities are more limited from his medication usage and the side effects associated with those than from his physical diagnoses in and of themselves. He is limited with decreased concentration and grogginess while at work, and he feels that this is what led to his discontinuation of his employment. However, I did not find any work reports that stated what specifically caused the termination of his employment.

---

[3] In that case, as here, the VA gave the claimant "a 70% service-connected disability rating but [paid] him at a 100% rate because they found him unemployable." *Id.* at 912.

12

R. 455. As this quotation establishes, Dr. Cornett apparently was relying on plaintiff's subjective reports, rather than on any documented problems with side effects. During the second hearing, as summarized above, the ALJ repeatedly asked plaintiff whether he had told his doctors about the alleged side effects. Plaintiff gave vague answers, ultimately falling back on the strained assertion that, because these medications have known label side effects, the doctor should have inferred that plaintiff was experiencing them as well.

Other statements from this same report also support the ALJ's interpretation and cut against plaintiff's theory of the case. These include the following:

- "*Subjective* symptoms of right L5 radiculopathy *with no objective findings* on [today's] exam."
- "The veteran does report radicular symptoms in the left sciatic nerve distribution but there is *no evidence* of that on today's examination and *negative straight leg raising* is *again* noted."
- "Physical examination of the spine reveals forward flexion from 0 to 20 degrees with pressure at 20 degrees, *but not specifically pain*."
- "With regards to driving, if he drives *greater than 1 hour* he has increased pain in his back. He has occasionally used a cane, but is not using one today."
- Despite claiming constant pain, "[h]e is able to perform all of his activities of daily living *without difficulty*."

R. 453-455 (emphasis added).

Second, plaintiff argues that, although the ALJ relied on Dr. Fischer's testimony, giving it "great weight," the ALJ then overlooked two specific parts of his testimony that allegedly supported plaintiff's case. One was about plaintiff's neck problems and whether plaintiff would be able to look up or extend his neck on more than occasional basis. In response, the Government argues that Dr. Fischer's testimony about the possible neck limitations was equivocal because he initially opined that plaintiff should be limited to no more than "occasional overhead work bilaterally," which is a restriction, as the Government notes, the ALJ adopted. Dkt. #11 at 8. Additionally, the Government asserts that "there is no indication that neck

13

extension or overhead looking is a vocationally relevant restriction to the jobs that the ALJ relied on to find that Plaintiff retained the ability to perform work in the national economy: Cashier II, Toll Collector, and Router[.]" *Id.* In his reply brief, plaintiff offers no rebuttal to the latter assertion. Therefore, this Court finds that the ALJ's analysis was at best harmless error.

Plaintiff also complains that the ALJ found that plaintiff could do light work whereas Dr. Fischer allegedly opined that he should be limited to sedentary work. This argument is unavailing because, as the Government asserts in its response brief, Dr. Fischer stated at several points in his testimony that plaintiff could do light work. *See* R. 44, 46. The Government thus argues that plaintiff's argument rests on "an incorrect understanding of the hearing record." Dkt. #11 at 7. Again, plaintiff has not responded to this argument in his reply brief.

\*     \*     \*

Plaintiff's arguments for remand have focused on discrete aspects of the ALJ's decision. But they have avoided the central rationale supporting the ALJ's opinion. This is the credibility finding. It was the backbone of the decision. The ALJ relied on multiple points in concluding that plaintiff's statements about his pain and limitations were not credible. The ALJ noted various ways in which plaintiff failed to pursue conservative treatments, such as physical therapy, and that those treatments generally worked when they were tried. *See, e.g.,* R. 136 ("The claimant was offered physical therapy and epidural injections, but he declined both[.]").The ALJ noted that "two different" (and conflicting) pictures were given about how plaintiff lost his job in January 2009. R. 139. Plaintiff has not challenged these factual findings nor the accompanying legal analysis. At the second hearing, the ALJ repeatedly asked plaintiff about these issues. Unlike many cases where claimants offer an explanation, such as financial inability to obtain treatment, neither plaintiff nor his counsel raised any such arguments.

14

In conclusion, the plaintiff has pointed to some evidence supporting his theory of the case, but the ALJ has pointed to other evidence supporting another reasonable view of this same evidence. Accordingly, this Court has no basis for overturning that conclusion. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971) (substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable).

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date: November 13, 2017　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge